versus the school district. Thank you, Your Honor. May it please the court. My name is Carl Solano. I represent the School District of Philadelphia. Judge McKee, may I reserve four minutes for rebuttal? Yes. Thank you, Your Honor. Your Honor, with me at council table is my colleague Joseph Ancelet and Sherry Swirsky, who is the general counsel of the school district. Appreciate that. Sometimes attorneys will come in with associates and we never ever find out where they are. Sometimes they're the clients, so it's always kind of nice to know who's sitting there. They do the work, Your Honor. I'll be ganging up on Ms. Serrani, but she'll probably be able to handle it just fine. Thank you, Your Honor. Your Honor, we are here today in a case under the Individuals with Disabilities Education Act, and the question is whether the school district's obligation to provide the plaintiff's daughter Courtney with a free appropriate public education includes an obligation to pay for her admission to and her medical treatment at a psychiatric treatment center called Supervised Lifestyles, SLS. The plaintiff's claim that the school district denied Courtney a free appropriate public education, both when it deferred preparing an IEP at the time Courtney was admitted, and later when it had been prepared that IEP. But in each case, I'm sorry. There's some disagreement about, I guess it's a November IEP. It wasn't clear to me whether or not there is agreement about the sufficiency of the IEP. There was one point, I guess, when an IEP was not prepared because, at least from your contention, Courtney wasn't at a point where it made any sense to prepare an IEP for her. That's correct, Your Honor. There was another point where there was an IEP and there's an issue about the IEP. That is correct, Your Honor. Courtney was admitted to SLS in May of 2005. At that time, the school district asked to evaluate Courtney. Excuse me. What actually precipitated that placement at SLS? The parents admitted, had Courtney admitted to SLS because... What was her condition? What brought it about? She was in a state of psychiatric crisis, Your Honor. That's the way she was described by her own psychiatrist who examined her, Lisa Goldstein, for example, and other medical personnel who looked at her. She was in a state of... Lisa Goldstein, in fact, said this is a sick person or a sick girl. Your Honor, that's the quote. This person is sick. And therefore, and she had been admitted to a psychiatric facility in Texas, Meninger Clinic. Meninger treated her for a few weeks. Meninger said that we are not the appropriate facility. She needs a different facility and the parents then had her admitted at SLS. And she had been at Meninger before? She had been at Meninger for about two weeks, Your Honor, yes. And that worked out fine? I'm sorry? That worked out fine, the first treatment? There was one location I thought was Meninger where she went, the response to treatment was fine. In fact, she went on to become, to do quite well in school. She was valedictorian. Was that Meninger? I'm not sure, Your Honor, what you're referring... She was at Rancho Valmora, which is a school. She left Rancho Valmora because they concluded that she had a medical need for a different type of facility. She then was in Meninger for about two weeks. They treated her, but they concluded that they simply could not continue to treat her because they were not the appropriate facility for her. Why were they not appropriate? What was the difference between Meninger and SLS? Your Honor, as I understand it, Meninger dealt with a different type of patient. I can't tell you exactly what it is. I think some of it had to do with the age of the people that were treated there. I'm not clear on the record except that Meninger simply said that they were not an appropriate facility for her. Is there any dispute that SLS provided no academic services? Your Honor, there is no dispute in the record that I can see that SLS provided no academic services. The only academic services that were provided to Courtney at SLS were a tutor that was supplied by the school district, not by SLS. So essentially, education has to be outsourced from SLS? That's correct, Your Honor. That's correct, Your Honor. They have no teachers on staff. They are not an accredited school. They have no educational foundation whatsoever. They are a mental health facility. And was that tutor provided pursuant to the existing IEP? I'm sorry, the tutor? The tutor that was provided at SLS. The tutor was provided, Your Honor, while they were creating an IEP. After Courtney was admitted in May, it was concluded that she wasn't ready for any educational treatment whatsoever. However, the school evaluated her situation, had a psychologist review records, things of that nature. And as soon as the school district was informed that she was in a position where she could be evaluated, the school district provided a tutor in math and English because prior IEPs showed that's what her needs were. That's what the records showed her needs were. Why wasn't that provided pursuant to the then-existent IEP? Your Honor, you could say that it was provided pursuant to the IEP from back at Pathway. I mean, I'm not sure that it was actually key to that IEP. It was key to the understanding that everyone knew she needed tutoring in math and English. That's what the records showed, and so that's what they provided her while they prepared an IEP, which they did in a matter of weeks. I mean, they started the tutoring, I think, in mid-October. They had her evaluated by a psychologist two days later. The psychologist confirmed that those were her needs were. An IEP team met in November. The IEP team in November then prepared an interim IEP for the next three months, and that endorsed the tutoring for three hours a week, which was then increased as she was able to take greater tutoring over a longer period of time. We factually hear, as well as in terms of the reimbursement, we have two discrete periods of time. Correct? Correct. And you differ with the district court's determination as to that second period of time from post-October 12 of 2005. Is that right? That's correct. So, everyone agrees there's no educational service provided at all during that first period from May 23 to October 12. That's correct. We tried to provide it, and we're told by the medical staff that it was inappropriate at that time. That's correct. Educational services were provided beginning in October when the school district was informed that she could now be evaluated and receive some limited services. Yes, Your Honor. And that is through the tutor who's... Yes, provided by the school district. ...who is provided by the school district. Who made that determination? Was that SLS, or was that the school? The school district made that determination, Your Honor. Upon being informed by the parents who were informed by SLS, that Courtney now could receive some limited amount of education. Judge Stearns anticipated my next question because I wanted to know if there was any dispute with respect to that first period of time, both that she was not susceptible to any kind of educational service, but that the parents did not seek to have any such educational service provided for her during that first period of time up to around mid-October of 2005. Judge Smith, what happened in that period in May was that the school district convened a fact-finding team to determine what education should be provided to Courtney. When the team met, the team was informed by Tracy Peck, who was a member of Courtney's medical team, the behavioral therapist who's a member of the team, that Courtney was too sick to receive education at that time. And on the basis of Ms. Peck's advice, the school district concluded that it could not provide education. The parents, Judge Smith, agreed with that. And the parents said, yes, she is too sick to receive education at that time. We will inform you when the time comes when, on the advice of SLS, she is now able to receive education. And that's what the parents did. That's uncontested. Your Honor, that's uncontested, but let me say this. I think that the argument that is made by the plaintiffs is that there nevertheless was an obligation on the part of the school district to provide what they will refer to as residential placement to Courtney during that period, which means pay the hospital bill. That their idea of education that was needed by Courtney during that first period of time is that she needed placement at SLS. And since that is what she needed, their view is that the school district should pay the bill for that placement. Hence, we have the basic disagreement here as to whether that is a medical service for which the school district is obligated to pay or whether it is an educational service. And how do we draw that line, Mr. Solano? This circuit has very little jurisprudence that seems helpful. We have the cruel decision of this Court. What can we derive from cruel and how do we go about making determinations of segregability of these services? Judge Smith, cruel has been the starting point for every court that we have seen that has considered this issue outside of the Third Circuit. And what the courts have done, as they have said, you look to see whether the primary purpose for providing the service is medical or whether it is educational and whether you can segregate. And in doing that --" Well, primary purpose when? Let's say everybody agrees. And perhaps not everyone does. But let's assume that everyone agrees that a medical crisis was what eventuated the placement in May of 2005. But her condition isn't going to remain static, or most conditions do not remain static. So at what point does some other factor come into play for determining whether or not education at least can be offered or whether or not she is amenable to not merely treatment there, but educational service? Judge Smith, I think you look at the totality of the circumstances for what is being done for Courtney. I want to come back to your question about factors. But first, to answer your question, I think the time when that happens is when Courtney was no longer in need of psychiatric hospitalization. And at that point she was able to move to an educational facility because now there is a facility that would provide her with a program that would service her educational needs. But before then, Judge Smith, in terms of factors, I think you have to look at what type of facility she's in. First of all, and this is what the courts in the Seventh Circuit, the Ninth Circuit, that have considered this issue, have looked to. They say, first of all, what kind of a facility is this? Is it an educational institution or is it a medical facility? And as we discussed a minute ago, I don't think there's much question about that. No teachers, no academic staff. It's under the New York Office of Mental Health, not under the New York Education Department. But couldn't a purely medical, psychological facility, residents there be required in order to allow a person to benefit from educational training? Judge McKee, in that situation, you would admit the person at an educational facility that also provides educational services. And in fact, there are all sorts of those. Pathway, Devereux, Rancho Valmora, which are among the places that Courtney was at here. But when she is in need of a medical facility for a medical crisis, you go to a hospital. But it's not the place... So the key word here, in your argument, as I understand it, is hospitalization. The key word is hospitalization as indicated by the type of facility, the type of services that it provides, services by a psychiatrist, a trained medical staff, and by the need of the patient who goes there. And everyone agreed, as you mentioned earlier, Judge Stearns, Courtney went there because she was sick, in the view of her own psychiatrist. That was the universal conclusion of everyone who has looked at this case. From that premise, what if Courtney was capable of attending school half the day, but needed daycare, outpatient psychiatric services to sustain her ability to return the next day? Would that be covered? I don't believe so, Your Honor. I believe that... Well, I mean, you have to look at why she's a psychiatric... You might be pushing for too much there. I'm sorry, Your Honor. You might be pushing for too much there to say that wouldn't be covered. I mean, because it's outpatient. She doesn't need it to be in a school. And the reason... And related services are the services that you need to be in a school. I mean, you don't... You do not cover every visit to a doctor because a student is going to need good health in order to be able to attend school the next day. But as I understand the hypothetical, without the services that the person gets when not in school, the person would not be able to return to school, would not be able to benefit from the educational training. Your Honor, I think that you may need psychological services of some sort. I mean, it's going to depend on exactly what it is. But there are psychological services and psychological services. And full-time psychotherapy of the type that Courtney was receiving here certainly would not be covered. That's not even covered under the definition of psychological services in the regs under the IDEA. Certainly a treatment by a psychiatrist in order to be able to attend school the next day would not be covered. Everyone, I think, agrees that services by a doctor are not covered. Whether you need some sort of outpatient-related services because you're visiting, say, the occupational therapist at 5 o'clock at the end of the school day, so after the end of the normal school day, and whether that is helpful, I don't know, Your Honor. I think that is a harder case. But, Your Honor, that's a very different case from psychiatric hospitalization, where your reason for being there under the opinion of every professional who testified in this case was that Courtney was sick and she needed it for a medical crisis. And remember, again, we're dealing with a facility that is providing an integrated medical program. It's providing a single program with a psychiatrist and a psychologist and a behavioral therapist with drug therapy and with psychotherapy. It is an integrated medical program to deal with the fact that Courtney was suffering from psychosis. If Courtney, because she's suffering from psychosis, needs to be stabilized, for lack of a better term, as she seemed to be in May of 2005, is that in and of itself enough to warrant reimbursement for the medical services because her stabilization is the sine qua non of her being able to learn at all? Your Honor, no. Because, I mean, basically what that says... Isn't that what Krull seems to allow, at least on the one hand? I mean, I'm grappling with this test, as I guess it is, from Krull, which says, which is essentially whether full-time placement may be considered necessary for educational purposes. That's the sine qua non situation I'm talking about. Or whether the residential placement is a response to medical, social, or emotional problems that are segregable from the learning process. How do you ever segregate, in a meaningful way, the kind of psychosis that was diagnosed here and that at least animated her behavior early on in 2005, from her amenability to education of any kind? Isn't it essential to stabilize her in that way? Your Honor... For her to ever receive educational services of any kind? Your Honor, Krull also said that the test is whether the residential placement is part and parcel of a specially designed instruction. I think that the way Krull draws the line is that the treatment, if you will, the services that are provided must be one and the same as the educational services that Courtney needs. And that is not the case here. What we're saying here is that before Courtney can ever get to education, first she needs to be stabilized medically. And that's the first period of time you would say, clearly. Your Honor, I would say that for both periods of time. Because I understand we're providing tutors, but that doesn't mean that the primary focus of the hospitalization is not medical. It is. That's why she's still there. The medical people are doing what they have to do, and you, the school district, are doing what you're required to do. And we are doing what we are required to do at the sufferance of the medical people who are telling us when we could be there and how long is appropriate. I mean, we didn't go in there until the medical people said, okay, you could start now to evaluate her. You could start to provide something. But she's still in a medical program full time for all the time that she's there. That's the reason that she was there. She didn't come out of that until July of 2006. And yes, gradually, as part of that process, the school district provided tutoring, and it increased it from three hours to six hours. And it did what it could do for her. But that does not mean that while she was there, the primary focus was not a medical program. So, Your Honor, I think the answer is that just because someone needs health before they can be educated, that does not make them so intertwined that the school district under the IDEA has to pay for getting them well. If that's the case, then you don't just have a problem with psychiatric hospitalization. You have it with any hospitalization. The court in Clovis, the Ninth Circuit decision, addressed this issue. And what the court said there is the psychotherapeutic services, the person there was named Michelle, received may be qualitatively similar to those she received in a residential placement, but it's clear that some may be provided as part of education. But the intensity of the program indicates that the services she received here were focusing on underlying medical crisis. And that's what you look at. What is the main reason she's here? And everyone agrees she's here for a medical reason to address a medical crisis. Thank you, Mr. Thank you, Your Honor. May it please the court. Good morning, Your Honors. My name is Gabrielle Cerini, and I represent the family, Bruce T., Letty T., and Courtney T. in this appeal. I'd like to begin, Your Honors, by asking whether it would be proper for me to ask for permission to reserve two minutes of rebuttal time since these are cross-appeals. No, it's a cross-appeal, but we prefer that you can take it, the issues you want to raise on cross-appeal, rebuttal. It's a bit awkward, but frankly, I personally think it's better if you do that. But historically, what we've always done is just ask you to try to anticipate. We've been very liberal on time. And I think you get a pretty good idea as to what the arguments that he would want to raise that you want to address in your cross-appeal. You're really talking about the first period, and rather than divvying it up into period one and period two, whether or not you're entitled to coverage for the entirety of the period. And it's really the same issue. It really goes to the very same inquiry under Cruel-Clovis, which you don't really – I think you said a footnote in your brief, but you don't really focus on it. But maybe we can have the discussion all at once. Now I've taken about two or three minutes of your time to answer your question, but as I said, we're probably going to let you run over. Does that answer you? Yes, very well, Your Honor. If a lawyer answered my question like that, I'd be upset. So I apologize for the answer. Thank you, Your Honors. At the heart of these appeals is a fundamental dispute as to what constitutes education under the IDEA. The school district – Was it education or related services? Well, I believe it's education, Your Honor, because the position that the school district has taken throughout this litigation and which, unfortunately, the district court espoused, is that education is limited to academic instruction. And the school district hangs its hat on this definition. The plaintiffs, the family, has taken the position throughout that education includes more than academics, because as this court has stated repeatedly in MC, in Cruel, in Polk, education includes, beyond academics, that's certainly part of it, the social, emotional, and physical progress necessary to move disabled children toward the goals of the IDEA, which are self-sufficiency and independence consistent with their cognitive potential. Does it matter to that distinction that Courtney's issues are innate as opposed to external? Take the example of a child who's in a terrible automobile accident and obviously has to be brought back to a help before she can be returned to a school setting. You're not arguing that that would be covered? If she were physically incapable of returning to a school setting? No, I mean, that's not the case here. And, in fact, we completely – What's the difference? Help me with that, because if you're saying that if she were in a car accident and not able to return, that wouldn't be covered. Well, the school district – What you're saying is basically the school district's position. They have likened Courtney to a student who is in a coma. In fact, they have said that her condition – she was actually less able to access instruction than a student in a coma. We disagree with that. But you said yes to Judge Stern's question, that maybe it's misunderstood. I might have misunderstood it. We do not agree that this is – You're saying the IDEA would cover his scenario, car accident. You need medical services to go back to school. The school district pays for your medical services in the hospital as a result of the car accident. The school district would pay for the educational piece of the services that the student required in the hospital. Define the educational piece. Well, even students in comas require physical therapy, occupational therapy. These things are within the ambit of education under the IDEA. But Tatro and Cedar Rapids, which are the two controlling Supreme Court decisions, do draw a distinction between medical services for which a school district is not responsible and services for which they are. Where in IDEA do you find that? What are you relying on? When I say what, Your Honor? As broad a definition of education as you give. Where do you find that in the Act? What I'm finding, Matt, is in this Court's interpretation of the Act under M.C. Crewell and Polk, and essentially the language that I've just given the Court comes straight from those cases where IDEA as a remedial statute needing to be broadly interpreted to protect this class of citizens has been interpreted to include far more than just academics. And the practical implications of that, Your Honor, are fairly obvious, if I may give an example. Many special education kids, their programs don't include academics at all. They never see the inside possibly of a normal classroom environment. Help me with this hypothetical, and then I wanted to make a slight change in that. So that I am clear, you're saying that if a student is in an automobile accident, needs purely medical attention, hospitalization, to go back to school, traction, blood transfusions, all of those things the school district would have to pay for, that's under the IDEA, to get the kid back to school. Is that what you're saying? Not for medical services, as that is defined under Tatro and Cedar Rapids, which are medical services. What if the student was so traumatized by the accident that he or she just can't concentrate? Every time the kid thinks about going back to school, they freak out, they have flashbacks to this automobile accident, and they require a long term of psychiatric care as a result of the car accident. The school district would have to pay for the psychiatric care of them. Your Honor, I think that that's a different case, because in that situation, you don't have a student who's been identified as an emotionally disturbed student. This is not an isolated crisis. How does that make a difference? Maybe it does. I'm not sure it does. Well, Your Honor, if I may answer the question, the school district has identified Courtney as needing special education because of a primary disability of emotional disturbance. All these difficult cases are particularly difficult, but this one is really particularly difficult, because there was a period where she really got up and running, and she was on her own, she was valedictorian. So for that snapshot of her life, she was fine. She was like the kids in the automobile accident, but because of something which is momentary, it causes the kid to be in a situation where they then need these kinds of services, and the issue becomes what's the nature of these services vis-a-vis the IDEA. If we look at her, even though she's had some history of problems, as being someone that for a time in her life was really able to do okay academically, even without any kind of support, although that may be an overstatement, because I don't know what kind of support she had when she was valedictorian, but she was truly able to function, survive, and function at a very high level in the school district. She then has a, I guess it was fairly described as a psychotic episode, and needs these services. Why isn't the psychotic episode, given her history of achievement, the same as the automobile accident, which puts a kid in a situation where they need psychological intervention to get back to school? Because the achievement that you're describing occurred after a period of over a year at SLS, where Courtney was receiving the types of services that she needed, and we don't concede that this was a psychotic episode or an acute crisis. This is a student whose emotional needs ebb and flow. I'm sorry, you don't concede that what was an acute episode or crisis? That what preceded SLS was an acute, isolated, psychiatric crisis, separate from her disability. She's a student with an emotional disturbance, which means emotional issues are part of who she is. Always a challenge. Help us write this opinion, if you are right. There's a big if on both sides here. But how do we write an opinion which does not make the school districts of the world the health insurers for everybody who's of school age? Because whenever anybody has an impact, like the car accident, it could be anything that causes the kid to be in a situation where they need medical intervention, psychological intervention, to be able to benefit from an education. How do we write an opinion in a way that doesn't require the school district to pick up the tab for any kind of injury which interferes with this child's ability to learn and benefit from education? And I understand the court's concern about that, Your Honor, but I think that what CRUEL demands, the standard in CRUEL, is a case-by-case determination of the types of services the student was receiving in the residential program. So why can't you then, to meet the segregability aspect of CRUEL, simply hold the district responsible for providing, as occurred here in the second period of placement, strictly educational services and hold either the parents or some other agency or entity, if there is any out there, responsible for the residential treatment that was considered medically necessary by Courtney's own psychiatrist, Dr. Goldstein? The Supreme Court has drawn a distinction between what services the school district is responsible and what services some other agency would be responsible in Tatro and Cedar Rapids. The school district is not responsible for medical services that are required to be provided by a licensed physician. The school district is responsible for the cost... Excuse me. Dr. Goldstein's recommendation in her report, number one recommendation, was long-term, for around 12 to 24 months, placement in a residential treatment facility is medically necessary. Your Honor, and she also stated that Courtney's medical and educational needs were intertwined such that they weren't segregable, which is what CRUEL says. Residential placement is authorized not only under the IDEA regulations, but under CRUEL when that's the case, when the student's needs cannot be untangled medically and educationally. The problem with that is, and maybe it gets down to the kind of, maybe it's a policy kind of inquiry, which I hope it doesn't resolve on, but it may be an approximate cause kind of inquiry that bleeds over to a policy focused on the statute. But how can you ever have a situation where you can draw a nice, neat line between educational needs or what the kid needs to be able to benefit from education on the one hand and medical needs or psychiatric needs on the other? Don't they always bleed together? I believe they do, Your Honor, and we're not asking for a bright line or an extension of CRUEL. We're simply asking that the standard that this Court set forth in CRUEL be applied to the facts in this case, which are that we have two school district psychologists during this relevant time period. The first was Harvey Thompson, who did a reevaluation in June of 2005, who recommended at that time that what Courtney needed was a residential treatment center placement for emotional disturbance. In October of 2005, when school district psychologist Holly Cohen did another evaluation of Courtney, she said that the students' needs could not be disentangled. They were intertwined. And she didn't recommend a residential placement because she said that the Philadelphia School District has a policy that their psychologists are not allowed to recommend residential placements. However, that's clearly in contravention with the law. But she said the needs were intertwined. And so what we're asking the Court to do is to take the CRUEL standard and apply them to the facts of this case and find that the residential program was necessary. But Your Honor brought up the issue of proximate cause, and I'd like to address that just for a moment if I may by putting some critical facts in context here and correcting a factual conclusion of the district court. I think it's important to remember that as of December of 2004, Courtney's last district-offered placement, Pathway School, was no longer appropriate. The parents went to the school district and told them immediately that Pathway was no longer appropriate. And instead of offering to help make Pathway appropriate, reevaluating the student, giving any help whatsoever to look for a different placement, the school district took the position essentially that we're not responsible for this child. We're not going to help you. And they didn't. The next five months that ensued consisted of a frantic search of the parents looking for a placement for this child that took them across the country. In those five months, Courtney went from Pennsylvania to New Mexico to Texas, back to Pennsylvania to New York. And at the end of that five months, this emotionally disturbed child who wasn't doing so well to begin with was understandably not in great shape by the time she reached SLS. However, the school district is putting the onus of that condition and that situation completely on the student and calling it an acute crisis. And I would ask the court to look at what happened to her in the context of the school district essentially refusing to serve her because of her condition, and if not creating the situation, at least exacerbating it. Another issue that I think ---- I don't think it's enough to say that this can be decided case by case. Case by case, you're always going to rule for the Courtneys of the world. It's just too compelling. That doesn't work as a matter of policy in interpreting the law. So I want to go back. As I understand now, you really did mean to say yes when I gave the correct hypothetical. At least the medical costs would not be covered. Judge McKee then extends the hypothetical. The trauma of the accident now disables the child. The child can't cope with the learning environment. You would say that is covered, the treatment for that trauma. The medical treatment would not be the responsibility of the school district. Right, but we now made the transition to psychiatric or psychological care. That's covered. Yes, if the services were educational in nature, under those definitions and interpretation of the IDEA. Child or reentry into an educational environment. Yes. What if it's the trauma, not the accident, but of the injury, if you follow the distinction? The child now is so traumatized by the hurt to her body because of the accident. Without psychological counseling, she can't return. If it was determined by the child's IEP team that the student's needs now required her to have special education in order to deal with what was happening, then yes, it would be covered. So I look to the credential of the treating. You look to the credential of the treating person. Yes, exactly. And in Pennsylvania, Your Honors, the agencies and school districts have entered into a memorandum of understanding, which can't be forgotten in this case, which contemplated situations exactly like this and where it was agreed among those agencies that in situations where there's a question about the nature of the services, the school district essentially fronts the money and is the payer of last resort, but essentially fronts the money. The school district has recourse to go to the public agencies responsible for medical services. The T's don't have any recourse. And that memorandum of understanding was also specifically contemplated in the IDEA, which authorizes. It doesn't help us. Maybe we get the idea. I'll just finish that mic. But the fact that they don't have any resource, and that goes to what Judge Stern said about how compelling these cases are on behalf of the parent, but it doesn't help us interpret and apply the IDEA to this situation, does it, the fact that they have no recourse? Well, because they may not have recourses, but they have rights, Your Honor. IDEA says that a FAPE is the right of every disabled student, no matter what the severity, the degree of the severity of the disability. The right to FAPE is an undeligible. But if you're placed in a situation that is not an academic situation, not accredited, purely a medical, perhaps psychiatric facility, unable to get any kind of educational attention, help me get from that placement to a FAPE. But, Your Honor, that's not this case. And I think that I need to highlight. That's not SLS? That's not this case. Absolutely not. SLS provided services, and we provided an expert report and supplemented the administrative record that spoke precisely to this. The district had no rebuttal report. What kind of services? Provided academic services, you're saying? No, Your Honor, not academic services. But our position is that academics does not equal. And you're totally right about that. Education, yes. What SLS did provide, however, as Mr. Klein, our expert, opined, were services that looked very much like what a school district's emotional support IEP would look like. Related services under the IDEA include, specifically, psychological services, counseling services, therapeutic recreation. In fact, the only medical services that are excluded under related services are those that are performed by a licensed physician under Tatro and Cedar Rapids. She was on a token economy system. She was receiving behavior modification. She was receiving individualized, one-to-one instruction by a behavioral therapist in these related services, specially designed instruction and related services. That's what special education is. That's the definition of special education under the IDEA. As far as the credentials of the behavioral therapist, school districts either have on staff or contract with behavioral therapists as a matter of course in order to implement the IEPs of their emotionally disturbed students. So as Mr. Klein opined, and as the district really offered no testimony to rebut this, these services were not medical in nature. The only service medical in nature that Courtney received were medication management consultations by a psychiatrist. Other than that, the services of the psychologist, that's also a constant member of an IEP team, and the behavioral therapist were educational in nature under the definition of related services in IDEA, the definition of special education, and as illustrated by the plaintiff's expert. Another troubling piece of the district court's opinion that I want to bring to the court's attention is that the district court based its denial of both compensatory education and tuition reimbursement for that first May to October period based on its wrong factual finding that the parents refused to consent to an evaluation in June of 2005. There is no record support for that conclusion, that factual finding, and even the school district is not claiming that it approached the parents and said, please let us evaluate Courtney, and the parents said, no, we won't give you consent. What happened was in June of 2005, and this is clear on page four of the district court's opinion, the district inquired about evaluating Courtney in order to develop a, quote, long-term academic program for her. Again, the key word there is academic. In the context of that proposal focusing only on academics, which Courtney was not able to access at that particular time, the parents, wanting to cooperate with the school district now that it was finally getting involved at all after so many months, didn't insist on an evaluation or an IEP for academics, yet the district court found that the parents refused an evaluation and relied on that very heavily in denying relief to my clients. And the records show that the parents actually did consent to a reevaluation, and it took place. Harvey Thompson, in June 2005, recommended a residential treatment center for emotional disturbance, which is what SLS was. SLS is not a hospital, and that is a contested issue. The plaintiff's. It is or is not? The issue of whether it's a hospital is a contested issue. The plaintiffs do not agree with the school district that it was a hospital. Is it a contested issue that it offers no educational component whatsoever to a person? Absolutely. Yes, it is, Your Honor. Yes. Again. Because of the way you're looking at education in the context of special education. Exactly, and education including more than academics. So it is not contested that there is no one who offers academic services on the staff, as opposed to what you would more broadly define as education? I don't know whether there's anyone who offers academic programming on staff. I do know that academic programming was not offered to Courtney during the period from May to October. Right. Academic programming. So it's not contested in that respect because you don't know? Well, it's not contested that it wasn't provided to Courtney, which I think is what the relevant inquiry is. And beyond that, I don't know. But I do know it wasn't provided to Courtney. It's not contested then that post-October of 2005, to offer her academic tutoring, it was required the school district to actually go off-site from SLS and use someone who was not SLS staff. It's not contested that the school district did use someone from not an SLS staff member to provide academics. That's correct, Your Honor. But the notion that a student can be so disabled as to not warrant special education services puts the whole basis for special education law back into the dark ages. As far back as special education law has existed, that was the Education for All Handicapped Act, which was the predecessor to the IDEA, the legislature has been concerned with giving the most entitlement to the most severely disabled students. Here, the school district is taking the position that the most severely disabled students have no entitlement to a FATE and that the school district was permitted to simply not give her any instruction because its only obligation was academics, which is just not correct. Even if the school district believed that she wasn't entitled to special education for a period of time, it didn't even procedurally do what it should have done, which would have been to exit her from special education, so that she was no longer, you know, to sever that obligation for a period of time. How do you do that? While she's at SLS, you mean? Yes, Your Honor. How do you do that? You give a notice of recommended educational placement to the parents, recommending that the student not receive any special education services anymore, and informed consent from the parents, and you provide them with procedural safeguards so that you're ensuring that they know what their rights are. Under IDEA, these are requirements under the law that were not done. Instead, the school district simply took the position that, well, the parents say she doesn't need academics, so we don't have to do anything until they tell us that she needs academics. In the meantime, she had very real educational needs that SLS was addressing and meeting in a very real way, but not strictly confined to the notion of academics. The issue of illness versus disability is also very misleading. The school district psychologist, Holly Cohen, made very clear in her testimony, and we've cited it in our brief, that mental health issues are covered under the IDEA under the category of emotional disturbance. The legislature saw fit to recognize that as a category, and said that school districts have to remediate students who have an emotional disturbance. The fact that her issue is a mental one, respectfully, Your Honor, is of no moment. Most disabilities, or at least many disabilities, have a mental component to them. If you have a specific learning disability, there's something different about your brain. I don't think there's an issue here about the disability. I think the issue is about the nature of the services, whether or not the services here fit into related services, and whether or not they get under the auspices of the IDEA. I don't think anybody here would doubt the fact that, given where Courtney was, that she was disabled under the meaning of the IDEA or any other meaning for that matter. Your Honor, I agree with that, and I think that there was a bit of a tangent in looking at the cause and looking at this as an acute crisis, rather than looking at what the program consisted of. Because the CRUEL standard asks us to look at the program itself. This Court has held, in Polk, which is also cited in our brief, that a special education program can comprise related services, and that for severely disabled students, related services can form the core of that student's special education program. My concern, and only my concern, we haven't discussed it, is how do we corral that? How do we write an opinion in such a way that doesn't make the school district the guarantor of the mental health of all of the school-aged children in the district? I think the first thing, Your Honor, is, if I may, and certainly it's not up to me to write the opinion, but I think the first issue would be a recognition that a school district cannot refuse to serve a student because of the student's disability, and the fact that... Right, and I don't think I could agree with you on that. That's not what's at issue. Again, we get back to whether or not these services are related services, and maybe the problem here relates back to the way we worded the test in CRUEL, which has now rippled out throughout the nation, and it makes sense in the abstract, but when we try to relate it to a specific set of services for a specific child, it becomes very, very problematic. I understand what you're saying in terms of the CRUEL test and the tetra test, the things which are not academic are nevertheless educational in nature because they get the person to a point where, for that person, that's what they need to be able to learn. But, Your Honor, I think that the legislature has already helped the court to figure out what services should be included in the definition of related services at 300.24, where it specifically includes as special education, which means education, which means we're not just talking about academics here. Related services means transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education, include speech and language pathology, audiology, psychological services, physical and occupational therapy, state recreation, including therapeutic recreation, goes on to talk about counseling, and the IDEA also very clearly authorizes placement in a public or private residential program when necessary to provide special education and related services to a child with a disability, including non-medical care and room and board, and it must be at no cost to the parents of the child. To return a little more narrowly to the facts of this case, something I think I may not have understood perhaps is my own lack of comprehension. The error you perceive the district court made with respect to phase one of the reimbursement, the SLS phase, is what you're saying is that SLS was in fact providing educational services as you define them or that the school did not intervene aggressively enough to provide services to Courtney at that point. Thank you for asking that clarifying question, Your Honor. It's both. Our position is that the school district had a continuing responsibility to provide faith to Courtney and completely failed in that responsibility by refusing to serve her because of her disability, and Your Honor, I do believe that's the school district's position. At least it was articulated in their brief as such. In the absence of any provision of faith for the student, the parents were then forced to find some program for her. The Burlington-Carter standard for reimbursement for placement says there are three prongs to consideration of whether a parent can get reimbursement in situations like this. The first is, was the IEP that the school district offered appropriate? We have no IEP here. The school district offered nothing. Well, there had been one in place. Yes, Your Honor, there had been one in place for the Pathway School in December of 2004, but that IEP was no longer valid as it was meant to be implemented at Pathway and the student was no longer at Pathway. So there literally was no offer of faith, and, in fact, the district court even specifically stated in her opinion that there's no contest, that there was no offer of faith. The issue is whether the district is correct in asserting it did not have to offer faith because Courtney was too sick to access instruction narrowly defined as only academics. The second prong of the Burlington-Carter test is whether the parent's placement was proper, and Burlington-Carter, Warren G., tell us that there is a relaxed standard of appropriateness for parental placements. They do not have to meet the same standards as placements that are offered by school districts. Here we're asking the court to look at the nature of the services as we've discussed them, as Mr. Klein has opined in his report, which was not rebutted by the school district, and determine that that placement was proper. And thirdly, equitable considerations also come into play, which I think are quite in favor of the plaintiffs in this particular matter, and that is the most troublesome aspect of the district's court's finding that the parents refused an evaluation. That simply did not happen. The parents merely agreed that an evaluation in the context of only for academic purposes would not have been appropriate, but never said we're not going to allow you to provide any educational services, and in fact SLS was providing appropriate educational services. And the Burlington-Carter test was applied by the hearing officer, and although the school district now claims in its briefs before the court that Burlington-Carter is not the correct test or the correct framework, that's not what it argued before the hearing officer in the appeals panel. In fact, it did argue the applicability of the Burlington-Carter test. So equitable considerations are important for tuition reimbursement. Another error on the part of the district court, unfortunately, was that the district court denied compensatory education based on incorrect factual findings and equitable considerations. Specifically, compensatory education is available when a school district has failed to offer a free, appropriate public education in the form of an appropriate IEP and placement, and then the student is entitled to services to compensate for that deprivation. In Lester H. v. Gilhol, which is cited in our brief, this court held that compensatory education is an in-kind remedy. If FAPE was denied, then the student is entitled to whatever services equate with that deprivation. The district court first wrongly found that the parents delayed provision of services, as we've discussed before, and then went on to say that equitable considerations prevent compensatory education relief when there's no support for that, and Lester H. in fact says it's an in-kind remedy. The only support the district court provided for that proposition was one district of New Jersey case, and nothing from the circuit saying that the parents could have been denied compensatory education. So for that period from May to October, we're seeking relief under two alternative but harmonious theories. One is that the parents should be entitled to reimbursement for SLS for that period under the Burlington-Carter standard, and if for some reason the SLS placement is found not to be appropriate, we assert that we're still entitled to compensatory education by virtue of the lack of absolutely any program offered by the school district. We've also argued in our brief that for the period from October to January, we assert that the hearing officer was correct. The IEP that was offered was not appropriate. It didn't appropriately address the needs that the school district's own re-evaluation in October of 2005 recognized, and for that reason we're entitled to tuition reimbursement. So you have addressed your cross-field very well and very thoroughly. Thank you. Thank you, Your Honors. Mr. Salano, if I give you the same negative invitation that I gave Mr. Schaffer, would I be incorrect in assuming the same response? Your Honor, there are a few things that I would like to respond to. Ms. Serrini covered a lot of ground, and I'd like to just respond to a few things. First of all, on academic program. I mean, the school district has paid for Courtney's placement at Rancho Valmoro. It paid for Pathway. It paid for Mainline Academy. It is not the case that the school district declines to pay for educational placement. The question here is, of course, is this an educational placement, and it's not. But why isn't it? If we look at what is educational vis-a-vis related services and a special education person, particularly with what the facts of Cruel were, why wouldn't the services that she was getting at SLS fit within the definition of related, quote, educational, close quote, services vis-a-vis Cruel? They're certainly in the nature of special education services, aren't they? Your Honor, first of all, it's not education. She was not receiving any education from SLS whatsoever. The argument is – You put the bag on the hat when you say education. Let's focus on related services. Related services, because that's really the point. First of all, Your Honor, I think the appropriate question under Cruel is the reason why the services are being provided. And the services were provided here for medical reasons, not for educational ones. And I think that goes as well to, Judge McKee, the question of, are the services the same? They're not. Let's take psychological services, because I think those are the hardest ones in the context of a psychiatric hospitalization. The idea is that because psychological services are included under the IDEA, that if she's receiving psychological services in a hospital, it must be the same services, and so why isn't it the same thing under Cruel? First of all, just because they're all psychological services doesn't mean that they're the same. The services provided in the hospital were to cure her psychosis. They were for a medical program. They are very different from the types of psychological services that would be covered for an educational program. Psychological services are for a medical program. They're excluded by the exclusion of medical services that are not diagnostic or evaluative. I think they are, Your Honor, because, I mean, even in TATRA, the Supreme Court noted that it's not just doctors that provide medical services. Hospitals do, too. But they're also, I think, Your Honor, take a look at the definition of covered psychological services under the IDEA. There's a reg on this, and I wish we had cited it in our brief. We didn't. The reg number is 34 CFR 300.34 C10, and it lists what are psychological services under the IDEA, and it covers things like administering and assessing tests, obtaining and interpreting information about child behavior and conditions relating to learning, planning programs to meet special educational needs shown by tests and behavioral evaluations, planning and managing a program of psychological services, including psychological counseling for children and parents, planning and managing, it doesn't say therapy, assisting in developing positive behavioral intervention strategies. Psychotherapy, certainly intensive psychotherapy as part of a medical program in a psychiatric hospital, don't fit under that definition. It's not the type of services that the IDEA contemplates as related services for an educational placement. And so we don't think the services are the same, even though they both may be labeled psychological. Your Honor, returning to something that Ms. Serrini said in her argument about whether the parents agreed that there was no need for the school district to develop an IEP at the time that Courtney was first admitted to SLS in May of 2003. There was a fact-finding meeting by the school district on June 15, 2005. I said 2003, I meant 2005. The notes of the fact-finding meeting are in the appendix at pages 131 and 132, and they say, parents stated that current IEP done at Rancho Valmora cannot be implemented because of Courtney's emotional status. Parents agreed that no new IEP is needed at this time, and the school district will continue to provide FAPE on an annual basis. Parents agreed. The school district deferred to the parents, but the school district also deferred to Courtney's medical provider. Under the argument that's being made by the plaintiffs, the school district was supposed to ignore the medical advice, ignore the advice of Courtney's parents, and somehow devise some sort of educational program, and we submit that doesn't make any sense. We are aware of no law anywhere that says that. And, Your Honor, the little law that we have found on this subject, there's a Fourth Circuit decision called Tice, says the opposite. With respect to, I said you looked at a reason for the service. I'm not going to repeat myself. With respect to the services being integrated and being one and the same, Your Honor, there have been findings on this issue. The appeals court rejected what the hearing examiner said on this subject, and the appeals panel said the record clearly and convincingly establishes that Courtney's admission to SLS was prompted by psychiatric crisis, was necessary for medical reasons rather than educational purposes, and that the services provided to Courtney during the first four months there were medical rather than educational in nature. And the appeals panel said that. It's circular because the issue becomes what is educational, and what is the appeals panel looking at educational in the context of related services in a special ed context. And, Your Honor, that's my last point. Educational under their definition really includes everything. Under that definition, you have to, any time anyone has a need for any sort of psychological service, and it can be, Your Honor, a child suffering from leukemia needing counseling. There are types of examples the court has already raised that that is automatically covered. And, Your Honor, there is no indication anywhere that Congress ever intended for the IEDEA to cover that type of cost. Thank you, Your Honor. Once again, this is an extraordinarily well-argued case. I know, Mr. Solano, I'm not sure you've ever argued before. Ms. Rainey, I do not know you. I'm pretty sure you never referred me before me. But it's really, today, in a sense, you have really vindicated the honor of the Third Circuit because the arguments we heard yesterday, I think, convinced my colleague on the left that he was never, ever coming anywhere near a Third Circuit courtroom again in life. But now maybe we'll get him back because you really have epitomized what good arguments should be. I thank you both. Thank you, Your Honor. Thank you. Thank you.